IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION NO. 07-737 |
| v. | : | |
| JAMAL TURNQUEST, MALIK BLAND, ROBERT WILLIAMS, ANTOINE ALICEA | : | |

INDIVIDUALIZED DETERMINATIONS OF THE APPROPRIATE SENTENCING GUIDELINE RANGE AS TO EACH DEFENDANT

FILED
JUL 16 2010
MICHAEL E. KUNZ, Clerk
By ______ Dep. Clerk

EDUARDO C. ROBRENO, J. JULY 15, 2010

## I. BACKGROUND

On November 27, 2007, Defendants were charged in a three-count indictment. This case involved 18 defendants,[1] as members of the Smith Crack Cocaine Gang ("SCCG") drug organization, charged with conspiracy to distribute 5 kilograms or more of cocaine and 50 or more grams of cocaine base ("crack"), in violation of 21 U.S.C. §§ 846 and 841(a)(1)(A). Certain defendants were also charged with substantive drug and firearm offenses.

This conspiracy was a widespread, multi-state pyramidal drug network named the SCCG by the Government and led by co-conspirator Kareem Smith. Beginning in November 2002, Smith led

[1] For the sake of completeness, the Court is attaching Exhibits A and B. Exhibit A, the Sentencing Chart, shows the Court's calculations as to each Defendant's sentencing. Exhibit B, the Culpability Chart, depicts the pyramidal structure of the SCCG organization, and the relative culpability and levels of cooperation provided by each Defendant.

at least seventeen other co-conspirators in the purchasing of cocaine in Philadelphia, Pennsylvania, the "cooking" of cocaine into crack in homes and rented hotel rooms in Philadelphia and Maryland, and the selling of crack throughout Philadelphia and Maryland. Once Smith learned that the demand for crack was higher in Maryland, he moved a large part of the organization there to capitalize on those potential profits. The conspiracy came to an end when Smith was arrested in September 2007.[2]

The following four Defendants proceeded to a trial by jury, commencing on May 8, 2009:

- Jamal Turnquest (07-737-02)
- Malik Bland (07-737-06)
- Robert Williams (07-737-14)
- Antoine Alicea (07-737-15)

On June 2, 2009, the jury found each Defendant guilty of distributing cocaine and crack in excess of five kilograms and

[2] At the time of Smith's arrest, the Government learned that the SCCG essentially functioned with Smith at the apex as the leader. The second tier of the conspiracy was comprised of Defendants Robert Williams, Antoine Alicea, and James Robinson as the cocaine suppliers. The third tier was comprised of Defendants Jamal Turnquest, Darryle Dunbar, and Landrum Thompson as principal managers. The fourth tier was comprised of Defendants Malik Bland, Daaniyal Muhammad, Vernice Garvin, Frederick Lecount, Steven Bernard, and Kenneth Baldwin as principal sellers. The fifth tier was comprised of Defendants David Spratt, David Carter, and Jeff Nunley as straight sellers. The sixth tier was comprised of Defendants Jason Yurth and Michael Martin who had minimal roles as drivers and procurers of hotel rooms.

fifty grams, respectively, in furtherance of the conspiracy.[3]

## II. APPROPRIATE SENTENCING GUIDELINE RANGES

To properly determine the sentencing guideline as to each remaining Defendant, the Court bifurcated sentencing. A hearing was held on March 5, 2010 to first address the length of time each Defendant was a member of the conspiracy, level of involvement (i.e., ranking in the conspiracy hierarchy), offense level, criminal history category and amount of drugs to be attributed.

A second plenary hearing was held on June 28, 2010 to determine the appropriate sentencing guideline range based on calculations of: (1) the quantity of drugs attributed to each Defendant in the conspiracy; (2) each Defendant's length of time in the conspiracy; and (3) each Defendant's role and culpability in the conspiracy.

The Court is now tasked with the challenge of providing individual sentencing determinations for the amount of drugs attributable to each Defendant in relation to the length of time of each Defendant's involvement in the conspiracy. In doing so,

---

[3] Defendant Williams was convicted of Count Four of the second superseding indictment, distribution of cocaine, which has not been challenged.

Defendant Alicea was acquitted of Count Two, possession with intent to distribute, and Count Three, possession of a firearm in furtherance of a drug trafficking crime.

the Court will employ the following calculation. First, the Court will determine the length of time (by week) that each Defendant was involved in the SCCG conspiracy. Second, the Court will estimate the amount of crack that was being sold per week by the SCCG drug organization. Third, the Court will calculate the length of time that each Defendant was involved in the conspiracy multiplied by the amount of drugs distributed by Defendant and the conspiracy, taking accomplice attribution into consideration. Due to the complex nature of this eighteen-defendant narcotics conspiracy, by reaching a conservative estimate as to the drug quantities distributed by the SCCG during a given time period multiplied by the length of time each Defendant was involved in the SCCG conspiracy, the Court believes that it can reach a just approximation as to the drug quantities attributable to each Defendant and, as such, comports faithfully with the measures set forth in United States v. Collado, 975 F.2d 985 (3d Cir. 1992).

Following these considerations, the Court will hold individual sentencing hearings for each Defendant at which time it will consider motions for departure, if any, and requests for variances, under 18 U.S.C. § 3553. At the conclusion of each of the individual hearings, the Court will impose its sentence.

A. Applicable Law

In sentencing determinations, the Government "bears the burden of proof by a preponderance of the evidence." United

States v. Paulino, 996 F.2d 1541, 1545 (3d Cir. 1993) (citing United States v. McDowell, 888 F.2d 285, 290 (3d Cir. 1989)).

"In imposing a sentence under the Sentencing Guidelines in a narcotics case, the district court relies chiefly upon the quantity of drugs involved in the offense." Paulino, 996 F.2d at 1545 (citing U.S.S.G. §§ 1B1.3(a)(2); 3D1.2(d)). The base offense level is determined by the amount of drugs involved in the offense, pursuant to § 2D1.1(3). Courts may necessarily estimate the drugs involved in operations or conspiracies where exact quantities are unknown. See id. ("Often the covert nature of the drug trade precludes seizure and precise measurement of the drugs that flow through a drug distribution conspiracy.").

However, a sentencing court may not sentence "a defendant for the entire amount of drugs in a conspiracy merely because the defendant has been found guilty of the crime of conspiracy." U.S.S.G. § 1B1.3. Members of a drug conspiracy should be sentenced for their "jointly undertaken criminal activity." § 1B1.3(a)(1)(B). Further, "[j]ointly undertaken criminal activity" is defined as "a criminal plan, scheme, endeavor, or enterprise undertaken by [a] defendant in concert with others, whether or not charged as a conspiracy[.]" Id.

A district court, in attributing drug quantities to each defendant, must make an individualized determination of the quantity foreseeable to each defendant within the larger

conspiracy. Collado, 975 F.2d at 985. Each defendant's relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." See § 1B1.3(a)(1)(B). Further, under § 1B1.3, "the district court may, under certain conditions, attribute to the defendant amounts of drugs possessed, distributed, sold or 'handled' by persons other than the defendant." United States v. Miele, 989 F.2d 659, 666 (3d Cir. 1993); United States v. Iglesias, 535 F.3d 150, 160 (3d Cir. 2008). This includes drug quantities outside the offense of conviction if the drugs are part of the same course of conduct or common scheme or plan. United States v. Williams, 917 F.3d 112 (3d Cir. 1990).

The Third Circuit has held that the standard for accomplice attribution under § 1B1.3 is stringent. Miele, 989 F.2d at 666. In Collado, the Third Circuit found that:

> a defendant can be responsible for the quantity of drugs distributed by his or her co-conspirators only if the drugs distributed (1) were in furtherance of the jointly-undertaken activity, (2) were within the scope of the defendant's agreement, and (3) were reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake.

United States v. Price, 13 F.3d 711, 732 (3d Cir. 1994) (citing Collado, 975 F.2d at 995).

In short, a sentencing court must conduct individualized and searching inquiries into each defendant's participation to ensure the sentence accurately reflects each

defendant's role and the amount of drugs involved in the conspiracy that was reasonably foreseeable to each defendant.

B. SCCG Conspiracy

Here, the second superceding indictment charged that, between November 2002 and September 2007, Defendants were members of the eighteen-person SCCG drug organization, which distributed in excess of 700 kilograms of crack and cocaine, conservatively valued at $13 million. See Gov't Omnibus Resp. 4. The pyramidal drug distribution scheme was highly profitable and entailed members doing different jobs, with varying levels of culpability, in order to carry out the object of the conspiracy.

To date, all but five of the eighteen SCCG Defendants have been sentenced. Before the Court are the four SCCG Defendants who went to trial: Robert Williams, Antoine Alicea, Jamal Turnquest and Malik Bland. In determining their appropriate sentencing ranges, pursuant to the Sentencing Guidelines, the Court will address each Defendant's participation seriatim.

The Court has reviewed the trial testimony, the Government's sentencing memorandum, and each Defendant's sentencing memorandum, has afforded the parties an opportunity to present evidence, and has heard the arguments made before the Court at the June 28, 2010 plenary sentencing hearing. After consideration of the parties' arguments, the Court will now apply

its calculation (length of involvement in the conspiracy per week multiplied by amount of drugs attributable to the conspiracy per week) and arrive at the appropriate sentencing range as to each Defendant in seriatim.

1. Length of Time in the Conspiracy

a. **Robert Williams**

Defendant Williams was involved in the conspiracy "from the beginning to the end" - from November 2002 to September 2007. See Gov't Sent. Mem. 6, 8.

Therefore, Defendant was involved in the SCCG conspiracy for its entirety: 11/02 - 9/07 = 58 months = 232 weeks.

Length of Involvement: 11/02 - 9/5/07 (approximately **232 weeks**)

b. **Antoine Alicea**

Defendant Alicea was also involved in the conspiracy "from the beginning to the end" - from November 2002 to September 2007. See id.

Therefore, Defendant was also involved in the SCCG conspiracy for its entirety: 11/02 - 9/07 = 58 months = 232 weeks.

Length of Involvement: 11/02 - 9/5/07 (approximately **232 weeks**)

c. **Jamal Turnquest**

Both parties agree that Defendant Turnquest was

involved in the conspiracy from approximately December 23, 2005 through October 16, 2006 (the date of Defendant's arrest). See Def. Turnquest Sent. Mem. 6 n.2.

Therefore, Defendant was only involved in the SCCG from 12/05 - 10/06 = less than 10 months = 39 weeks.

Length of Involvement: 12/23/05 - 10/16/06 (approximately **39 weeks**)

d. **Malik Bland**

Defendant Bland entered the SCCG conspiracy on approximately October 19 or 20, 2003, when co-conspirator Smith took Bland to Maryland to begin selling crack. See Gov't Sent. Mem. 19 (citing Trial Tr. 79-89, 5/27/09). Defendant Bland worked in Maryland for one-week prior to being arrested. Bland spent the next three years in jail and was released in 2006. Once he was released from prison, Bland immediately rejoined the conspiracy, transporting drugs between Philadelphia and Maryland for Defendant Thompson. On October 5, 2006, Bland was again arrested selling crack to an undercover officer.

Where Defendant Bland never signified an intent to withdraw from the conspiracy (as he rejoined the SCCG immediately upon release from incarceration), Bland is considered involved for the full three years of which he took part in the SCCG. See United States v. DePeri, 778 F.2d 963, 980 (3d Cir. 1985) (holding that to demonstrate withdrawal from a conspiracy, a defendant must "present evidence of some affirmative act of

withdrawal on his part, typically either a full confession to the authorities or communication to his co-conspirators that he has abandoned the enterprise and its goals."); see also United States v. Diaz, 1993 U.S. Dist. LEXIS 3569, *31-32 (E.D. Pa. Mar. 25, 1993) ("Arrest and incarceration, by themselves, do not evidence withdrawal from a conspiracy.").

Therefore, Defendant was involved in the SCCG conspiracy from 10/20/03 - 10/5/06 = less than 3 years = 147 weeks.

Length of Involvement: 10/20/03 - 10/5/06 (approximately **147 weeks**)

2. Amount of Drugs SCCG Distributed Per Week

a. Corroborating Evidence of Drug Quantities and Accomplice Attribution

Here, the Court will undertake a "searching and individualized" determination of drug quantities attributable to each Defendant. The Third Circuit has guided district courts in the need to estimate drugs quantities for each defendant, especially where the amount seized is not reflective of the drug distribution throughout the time period the drug organization was active. However, district courts are also cautioned that the estimation "is not a license to calculate drug amounts by guesswork." Paulino, 996 F.2d at 1545. "Instead, the sentencing court must carefully scrutinize the government's proof to ensure that its estimates are supported by a preponderance of the

evidence." Id. (citing Collado, 975 F.2d at 998); see also United States v. Wilson, 2010 U.S. App. LEXIS 9814, *10 (3d Cir. May 13, 2010) (non-precedential opinion) ("Collado made clear that "a searching and individualized inquiry into the circumstances surrounding each defendant's involvement in the conspiracy is critical to ensure that the defendant's sentence accurately reflects his or her role.").[4]

Further, "[c]ourts may estimate drug quantity using a variety of evidentiary sources, including testimony of codefendants about the amount of drugs the defendant transported and the average amounts sold per day multiplied by the length of time sold." United States v. Surine, 2010 U.S. App. LEXIS 7561 (3d Cir. Pa. Apr. 13, 2010) (non-precedential opinion) (citing United States v. Gibbs, 190 F.3d 188, 204 (3d Cir. Pa. 1999)); see also § 2D1.4, App. Note 2 ("In making this determination [estimating drug quantities], the judge may consider for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant . . . .").

Over the course of the SCCG conspiracy, Defendants Williams and Alicea together supplied "over one hundred kilograms

---

[4] See id. (citing U.S.S.G. § 2D1.4, application note 2) ("Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance.").

of powder cocaine" to co-conspirators Smith, Thompson, and Bernard for distribution by managers such as Defendant Turnquest and sellers such as Defendant Bland in Philadelphia and Maryland. This estimate is corroborated by testimony given at trial by cooperating SCCG co-conspirators, which specifies instances of drug purchases (from Defendants Williams and Alicea) and distributions (by Defendants Turnquest and Bland) over the course of the conspiracy. The testimony also indicates that the drug quantities distributed were known by each Defendant and/or were "reasonably foreseeable in connection with the" joint criminal activity underway. See Collado, 975 F.2d at 995. As such and for the reasons that follow, it is appropriate for the Court to attribute the full drug quantities sold each week to each individual Defendant for the length of their involvement in the SCCG conspiracy.

i. Testimony of Kareem Smith

Co-conspirator and SCCG leader Smith testified at length during Defendants' criminal trial about how the drug organization ran and the quantities of drugs sold throughout the relevant time period.[5] Specifically, Smith testified that, from

---

[5] During his grand jury testimony, Smith estimated a larger number of drugs were distributed by the SCCG during the conspiracy than Smith testified to during trial. The Court will accept the conservative approximation given in Smith's trial testimony. See Trial Tr. 136:24-143: ("Q: Okay. Mr. Smith, you would agree with me that you told the Grand Jury that you would get between six and eight kilos from my client and four to five

September 2002 to November 2002, he obtained approximately 9 ounces of cocaine per trip to Maryland from either of his two suppliers Defendants Williams and Alicea.[6] Smith also testified

---

kilos from another person, correct? . . . . A: Yes, I said that. Q: All right. And do you also recall, in response to the other purchases, that you would purchase about four or five kilograms of cocaine a week? A: Yes. Q: All right. So, in any given week, you were getting anywhere from ten to 13 keys a week? A: Yeah, you could say that.").

[6] Specifically, Smith testified that:

Q: How much cocaine were you and Tobe (Thompson) and Steve (Bernard) selling out of Jasons' house in September to approximately November of 2002, if you recall?

A: I'd say, about a half - a half - . . . .

Q: Okay. How much is a brick? . . . .

A: It's - how much does it weigh - it's 36 ounces.

Q: 36 ounces?

A: Right.

Q: Okay. So, half of that would be how many ounces?

A: Eighteen.

Q: And how long would it take you to sell 18 ounces of cocaine from this house?

A: I'd say, a couple days, about three days.

Q: All right. So, every two to three days, you would have to get another 18 ounces?

A: Yes.

Q: All right. So if you're selling - in two to three days, you're selling 18 ounces, are you getting that entire 18 ounces at once from either Toine [sic] or Bash

that by November 2002 (the start of the SCCG) he was obtaining 18 ounces (.5 kilograms) every two or three days. By December 2002, Smith estimated he had increased trips from Philadelphia to Maryland up to two to three times per day and would get 9 to 13.6 ounces of cocaine from either Defendant Williams of Alicea, whomever had a supply. See Trial Tr. 173-75, 5/20/09.[7]

Co-conspirator Smith also testified that both Defendants Williams and Alicea knew that the cocaine was being transported to Maryland because crack would go for $5 in Philadelphia but $20 in Maryland and because crack was popular with users in Maryland. Further, Smith testified that Defendant

---

or are you getting it in smaller increments?

A: Well, at the time, it was in smaller.

Q: And what was the approximate amount of powder that you would get on any one trip to either Bash or to Toine [sic] in September to November of 2002?

A: It was, like, nine ounces, half that, yes.

Q: Okay. So, that would be a quarter of a kilogram?

A: Right.

See Trial Tr. 161:16-163:9, 5/20/09; see also id. 170:10-16 (testifying that, in November 2002, Smith was selling "approximately, 18 ounces, every three days").

[7] As to Alicea, Smith testified that he went to his residence on Reinhard Street until the end of 2005, when Alicea moved to Penrose area and dealt to Smith from there. See Trial Tr. 187-188, 5/20/09. As to Williams, Smith identified his residence on Old York Road and also testified that he would sometimes buy from a Sunoco gas station near Williams' house. Id. at 189.

Williams specifically helped Smith "get back on his feet after" his 2005 release from prison by supplying him with a "look out" (ounce of cocaine powder) free of charge and thus Smith was able to keep the SCCG running.

ii. Testimony of Landrum Thompson

Co-conspirator Thompson testified that he was involved in the SCCG conspiracy from its inception and had been dealing drugs with Smith and Bernard since 1998. Thompson further testified that Williams and Alicea supplied both him and Smith (sometimes separately, other times together) with cocaine in 2002 and continued to supply them throughout the life of the conspiracy. See Trial Tr. 15:20-25, 86:25-87:2, 88:8-10, 93:5-15.

As to Alicea, Thompson would purchase between .25 and 2 ounces of cocaine when he was not with Smith and 9 ounces when he was with Smith. As to Williams, Thompson would most often purchase 2.25 ounces of cocaine. Between 2002 and 2004, Thompson would get cocaine two to three times per week, and afterward would get 2.25 ounces of crack every four days. See id. 25:2-22.

iii. Testimony of Steven Bernard

Co-conspirator Bernard testified that he began obtaining cocaine from Defendants Williams and Alicea in 2002, though he had met Williams in 1998 through Smith. See Bernard Trial Tr. 135, 5/15/09. As to Williams, from 1999 to 2006,

Bernard would buy .25 to 4.5 ounces of cocaine (sometimes alone, sometimes with Smith). Id. at 153:4-25; 154:1-13 (explaining that .25 ounces = 7 grams and 4.5 ounces = 125 grams). Bernard testified that he and Williams had conversations that the cocaine was being cooked into crack for sale, and explained that he would lose some quantity of cocaine when it was being cooked into "crack." Id. at 159.

As to Alicea, though Bernard knew him his entire life, he did not start buying from Alicea until 1998 when Smith introduced them. The buying pattern continued through 2006. Id. at 165-66. Bernard would purchase between .25 to 4.5 ounces of cocaine from him. Id. at 172.

In 2002, Bernard stated that he would purchase (from either Williams or Alicea) roughly 4.5 ounces of cocaine every three days (Id. at 175:9-10), or Smith and Thompson would purchase the cocaine and Bernard would sell the crack product. In early 2006, this quantity was increased to 4.5 ounces, two times a day; totaling 9 ounces a day. Id. at 179:23-180:9.

iv. Testimony of Michael Martin

Co-conspirator Martin, a driver for Smith and Turnquest, testified that he drove to a residence where Alicea had moved in 2007 and identified the supplier there as "Twan" (Alicea's nickname). See Gov't Sent. Mem. 12.

v. Testimony of Darryle Dunbar

Co-conspirator Dunbar also testified that he traveled with Smith to Reinhard Street to buy cocaine for resale from "Twiz" or "Twizzy" (another Alicea nickname). See id. 12-13.

vi. Testimony of Law Enforcement Operations Targeting Williams and Alicea

Special agents, using cooperators, made several buys off of Defendants Williams and Alicea. On August 31, 2006, Government Agents had arranged to buy from Smith, but he was out of town so Defendant Williams delivered 62.7 grams of cocaine hydrochloride to the cooperator in Philadelphia. Special Agent Harrison testified as to how the delivery was observed and recorded. See Gov't Sent. Mem. 13.

On September 17, 2003, Philadelphia Police executed a search warrant at Alicea's mother's home on Reinhard Street and recovered approximately 177.7 grams of cocaine, new clear ziplock packets, a loaded Glock model 17.9 mm semiautomatic pistol (serial # CRS060US) with 11 live rounds of ammunition, and loose boxes of ammunition. Also recovered was an Ohaus scale, white plate, and plastic spoon, all containing white residue. Also found was a ballistic vest, mail in Alicea's name and $4,900. See Trial Tr. 109-33, 5/14/09; see also Gov't Sent. Mem. 14 (noting that the Court may consider this evidence against Alicea as he was convicted on the conspiracy count, even though he was acquitted of the substantive counts of possession of controlled substances and the weapon in furtherance of a drug crime on that

date).

b. Weekly Approximation of Drug Quantities

The Court finds that the co-conspirators' testimony regarding drug quantities of cocaine purchased to be "cooked" into crack and distributed to be reliable estimations of the drug quantities sold weekly. Surine, 2010 U.S. App. LEXIS 7561 (citing Gibbs, 190 F.3d at 204). SCCG leader Smith testified that from 9/02 through 11/02, he was obtaining 9 ounces of cocaine from his suppliers (Williams and Alicea). Smith further testified that the supply increased in 11/02 to approximately 18 ounces of cocaine. By 12/02, Smith testified that he was receiving between 9 to 13.6 ounces of cocaine from his suppliers. Co-conspirators Thompson and Bernard testified that when they purchased drugs without Smith they would get approximately .2 - .25 ounces of cocaine, but it was increased when they were with Smith to 9 ounces of cocaine. Bernard testified that, by early 2006, he was purchasing 5 ounces each day, a couple times per week.

Therefore, the Court finds that the most conservative range of drug quantities distributed by the SCCG began in November 2002 began with distribution of approximately 9 ounces of crack per week and peaked throughout the life of the conspiracy, ending in September 2007, to 18 ounces of crack per week. Therefore, the Court will use the conservative estimation

of **9 ounces = approximately 255 grams** of crack per week for the entire length of the conspiracy to determine the average amount of drug quantity to be attributed to each trial Defendant.

3. Individualized Sentencing Calculations

The Court will now determine individualized sentencing calculations as to each Defendant. In order to arrive at a appropriate sentencing range for each Defendant, pursuant to the Sentencing Guidelines, the Court will employ the aforestated calculation: length of time each Defendant was involved in the SCCG conspiracy per week multiplied by the conservative estimate of drugs distributed by the conspiracy per week.

a. **Robert Williams**

Defendant Williams, as the cousin of co-conspirator Smith, was a *central supplier*[8] for the SCCG. See Gov't Sent. Mem. 6, 8 (noting that each defendant's role is relevant to their knowledge of the "joint criminal activity" and thus the propriety of accomplice attribution). Here, Smith testified that his "only two suppliers for cocaine" were Williams and Alicea, until Robinson became a third source in June 2006. Smith stated that he first began buying from Alicea in 1998 and continued after his release from prison in September 2002. See Trial Tr. 156, 5/20/09. Co-conspirator Robinson also bought cocaine from

---

[8] "Suppliers": Sources of quantities of cocaine as supply in Philadelphia for SCCG. See Second Super. Indictment ¶ 28.

Defendants Williams and Alicea upon joining the conspiracy in June 2006.

The Government further avers that both Defendants Williams and Alicea knew the amount the other supplier was selling to the SCCG (since Smith was getting approximately 9 ounces a week for the majority of the conspiracy from whichever supplier had the drugs) and that, based on the evidence at trial, both Williams and Alicea knew that the cocaine was being cooked into crack. See Gov't Sent. Mem. 6-7. Pointedly, the Government contends that Defendants Williams and Alicea were not, in fact, simple "sellers" to the SCCG "buyers," but instead were aware of the large-scale nature of the SCCG operation. Both Defendants had conversations with co-conspirators Smith, Thompson and Bernard about the cooking of cocaine and selling of the drug product, crack, throughout Philadelphia and Maryland.

The testimony at trial showed that the cooperators would individually purchase cocaine from Defendant Williams in North Philadelphia upon appointment. The evidence also shows that the SCCG purchased large quantities of cocaine from Defendant Williams over a long period of time and in consistent amounts and frequency. Further, Defendant Williams specifically made sales to Smith's customers when he was unavailable and that both Defendants would supply cocaine in crack form, after they converted it by cooking, when Smith needed it quickly.

Therefore, the Court finds that the Government has proved by a preponderance of the evidence that Defendant Williams knew of the joint criminal activity engaged in by the other SCCG conspirators (including drug quantities supplied by Alicea either in conjunction with or in place of Williams' supply) and can be held responsible for the total drug quantities distributed throughout the conspiracy for the entire length of the SCCG drug organization.

Defendant Williams is responsible for 255 grams of drugs per week for 232 weeks = 59,160 grams of drugs = 59.160 kilograms of drugs. As such, Defendant Williams is responsible for conspiring to distribute approximately **59.1 kilograms** of crack.

Pursuant to § 2D1.1(c)(1), for a violation of § 846, the drug quantity table states that a defendant responsible for 4.5 kilograms or more of crack is awarded a base level offense of **38**. As such, Defendant Williams has a base offense level of **38**. According to the PSI, Defendant Williams has a criminal history category III (based on 6 criminal history points) and received **+2** enhancement, pursuant to §2D1.1(b)(1), because a dangerous weapon was involved. See PSI ¶ 136.

Therefore, Defendant Williams has an offense level of **40** and criminal history category III, which places him in the sentencing guideline range of **360 months to lifetime**

**imprisonment**.

b. **Antoine Alicea**

Defendant Alicea was also a *central supplier* for the SCCG and was a SCCG cocaine supplier for the life of the conspiracy. See Gov't Sent. Mem. 6, 8. Based on his role in the offense and for the reasons state above, the Court finds that the Government has proved by a preponderance of the evidence that Alicea knew of the joint criminal activity engaged in by the other SCCG conspirators (including Williams' supply) and can be held responsible for the total drug quantities distributed throughout the conspiracy for the entire length of the SCCG drug organization.

Defendant Alicea is responsible for 255 grams of drugs per week for 232 weeks = 59,160 grams of drugs = 59.160 kilograms of drugs. Therefore, Defendant Alicea is responsible for conspiring to distribute approximately **59.1 kilograms** of crack.

Pursuant to § 2D1.1(c)(1), for a violation of § 846, Defendant Alicea has a base offense level of **38**. According to the PSI, Defendant Alicea has a criminal history category **I** (based on 0 criminal history points) and received **+2** enhancement, pursuant to §2D1.1(b)(1), because a dangerous weapon was involved. See PSI ¶ 136.

Therefore, Defendant Alicea has an offense level of **40** and criminal history category **I**, which puts him in the sentencing

guideline range of **292-365 months imprisonment.**

c. **Jamal Turnquest**

During his time in the conspiracy, Defendant Turnquest held the role of *principal manager*[9], acting as co-conspirator Smith's "right hand man," providing help running the drug organization, assisting by traveling with Smith to Philadelphia to buy cocaine, processing and packaging crack for resale to customers, and transporting and distributing that crack for SCCG customers. Defendant disputes his role of a "principal manager" in the SCCG conspiracy. Based on this role and knowledge of the drugs to be distributed throughout the entire SCCG conspiracy, the Court finds that the Government met its burden to demonstrate that Defendant Turnquest is responsible for the average quantity of drugs distributed per week as the crack quantities sold were "reasonably foreseeable" to Defendant.

Thus, Defendant Turnquest is responsible for 255 grams of drugs per week for 39 weeks = 9,945 grams of drugs = **9.945 kilograms** of drugs. Therefore, Defendant Turnquest is responsible for conspiring to distribute approximately **10 kilograms** of crack.

---

[9] "Principal managers": assisted in the delivery of weight quantities of cocaine, "cooked" cocaine into crack, obtained firearms for use in protecting the drugs and proceeds, and collected for drug sales. See Second Super. Indictment ¶ 28.

Pursuant to § 2D1.1(c)(1), for a violation of § 846, Defendant Turnquest has a base offense level of **38**. Defendant Turnquest also received **+2** enhancement, pursuant to §2D1.1(b)(1) because a dangerous weapon was involved and **+3** enhancement, pursuant to § 3B1.1(b) for a manager role in the offense. See PSI ¶¶ 135, 137; see also Def. Sent Mem. 7 (disputing principal manager role based on short time of involvement in the conspiracy).[10]

Therefore, Defendant Turnquest has an offense level of **43** and criminal history category **I** (based on zero criminal history points), which puts him in the sentencing guideline range of **lifetime imprisonment.**

d. **Malik Bland**

Defendant Bland's role in the SCCG conspiracy was first in Philadelphia than in Maryland as a *street seller*[11] (a more minor role) at one of the Maryland locations. Defendant Bland worked in Maryland for one-week prior to being arrested. Bland

---

[10] Defendant disputes his role as principal manager because (1) he was only involved in the conspiracy for 10 months; and (2) Smith was the leader. Id. 7-8 (citing Smith Trial Test. 152:5-153:7, 5/21/09). Clearly, where Turnquest acted as Smith's "right-hand man," he coordinated drug pick-ups/drop-offs and purchased/transported Philadelphia cocaine to Maryland to be cooked into crack, he acted as a principal manager with the SCCG conspiracy.

[11] "Sellers": sold and distributed the drugs procured and "cooked" by SCCG members. See Second Super. Indictment ¶ 28.

spent the next three years in jail and was released in 2006. Once he was released from prison, Bland immediately upon release rejoined the conspiracy, transporting drugs between Philadelphia and Maryland for Defendant Thompson. On October 5, 2006, Bland was again arrested selling crack to an undercover officer. Based on his role as a seller, incarceration due to his SCCG activities, and the fact that the drug quantities being distributed throughout his time in the conspiracy were "reasonably foreseeable," the Court finds that the Government has demonstrated by a preponderance of the evidence that Defendant Bland is responsible for accomplice attribution of the average weekly crack sales.

Defendant Bland is responsible for 255 grams of drugs per week for 147 weeks = 37,485 grams of drugs = **37.485 kilograms** of drugs. Therefore, Defendant Bland is responsible for conspiring to distribute approximately **37.4 kilograms** of crack.

Pursuant to § 2D1.1(c)(1), for a violation of § 846, Defendant Bland has a base offense level of **38**. Defendant Bland has a criminal history category **I** (based on zero criminal history points) and received **+2** enhancement, pursuant to §2D1.1(b)(1) because a dangerous weapon was involved. See PSI ¶ 136.

Therefore, Defendant Bland has an offense level of **40** and criminal history category **I** (based on zero criminal history points), which puts him in the sentencing guideline range of **292-**

**365 months imprisonment.**

## III. CONCLUSION

After consideration of the parties' pleadings and arguments, and an "individualized and searching" inquiry as to each Defendant's participation in the conspiracy so as to determine appropriate sentencing ranges for each Defendant, the Court will impose its sentence at the scheduled sentencing hearings for each Defendant.

An appropriate order follows.

## Exhibit A - Sentencing Chart

| "SCCG" 07-737 NAME | SENT. (months) | Cooperator Ranking __ out of 18 | Culpability Ranking __ out of 18 | Total Offense Level | Criminal History Category | Guideline Sentencing Range | Safety Valve | Mit. Role 3B1.2 | Agg. Role 3B1.1 | § 5K1.1 Mot. |
|---|---|---|---|---|---|---|---|---|---|---|
| 01 - Kareem Smith | 168 | 2 | 1 | 42 | VI | 360 - Life | No | | +4 | Testified: GJ & Trial |
| 02 - Jamal Turnquest | | | 5 | Trial | | | No | | +3 | |
| 03 - Darryle Dunbar | 90 | 3 | 8 | 40 | V | 360 - Life | No | | +3 | Testified: GJ & Trial |
| 04 - Daaniyal Muhammad | | | 11 | N/A | | Invol. Med. | No | | | |
| 05 - Vernice Garvin | 60 | 8 | 13 | 31 | V | 168-210 | No | | | Testified: GJ |
| 06 - Malik Bland | | | 9 | Trial | | | No | | | Pending Phil. murder case |
| 07 - Frederick LeCount | 84 | 10 | 10 | 35 | VI | 292 - 365 | No | | | Testified: GJ |
| 08 - Steven Bernard | 66 | 4 | 7 | 35 | IV | 235 - 293 | No | | | Testified: GJ & Trial |
| 09 - David Carter | 51 | 11 | 14 | 25 | III | 70 - 87 | No | -4 | | Cooperation; no testimony |
| 10 - Michael Martin | 6 mo. Probation | 5 | 18 | 29 | IV | 121 - 151 | No | -4 | | Testified: GJ & Trial |
| 11 - Jason Yurth | 36 | 13 | 17 | 27 | I | 120 | No | -4 | | Testified: GJ |
| 12 - Kenneth Baldwin | 72 | 9 | 12 | 33 | V | 300 - 322 | No | | | Testified: GJ |
| 13 - Daniel Spratt | 48 | 6 | 15 | 28 | VI | 151 - 188 | No | -4 | | Testified: Trial |
| 14 - Robert Williams | | | 2 | Trial | | | No | | | |
| 15 - Antoine Alicea | | | 2 | Trial | | | No | | | |
| 16 - Landrum Thompson | 84 | 1 | 6 | 40 | II | 324 - 405 | No | | +3 | Testified: Trial |
| 17 - Jeff Nunley | 54 | 12 | 16 | 31 | III | 135 - 168 | No | -2 | | Testified: GJ |
| 18 - James Robinson | 132 | 7 | 4 | 35 - Mand. Life | VI | Life | No | | | Testified: Trial |

**Exhibit B - Culpability Chart**

# KAREEM SMITH CRACK COCAINE GANG

(Cooperator / Culpability: out of 18)
(Offense Level / Criminal History Category)

## *Leader (+4)*

Kareem Smith

2 / 1
41 / VI
Sent: 168 mos.

## *Suppliers* (no role adjustments)

| Robert Williams | Antoine Alieea | James Robinson |
|---|---|---|
| _ / 2 | _ / 2 | 7 / 4 |
| 40 / III | 40 / I | 35 / VI |
| | | Sent: 132 mos. |

## *Principal Managers (+3)*

| Jamal Turnquest | Darryle Dunbar | Landrum Thompson (+2) |
|---|---|---|
| _ / 5 | 3 / 8 | 1 / 6 |
| 43 / I | 40 / V | 40 / II |
| | Sent: 90 mos. | Sent: 84 mos. |

## *Principal Sellers*

| D. Muhammad | V. Garvin | M. Bland | F. Lecount | S. Bernard | K. Baldwin |
|---|---|---|---|---|---|
| _ / 11 | 8 / 13 | _ / 9 | 10 / 10 | 4 / 7 | 9 / 12 |
| Forcible Medication | 34 / VI | 40 / I | 35 / VI | 35 / IV | 33/ V |
| | Sent: 60 mos. | | Sent: 84 mos. | Sent: 66 mos. | Sent: 72 mos. |

## *Straight Sellers*

| D. Spratt (-4 minimal role) | D. Carter (-2 minor role) | J. Nunley (-2 minor role) |
|---|---|---|
| 6 / 15 | 11 / 14 | 12 / 16 |
| 28 / VI | 25 / III | 31 / III |
| Sent: 48 mos. | Sent: 51 mos. | Sent: 54 mos. |

## *Drivers/Motel Procurers* (minimal role)

| J. Yurth (-4 minimal role) | M. Martin (-4 minimal role) |
|---|---|
| 13 / 17 | 5 / 18 |
| 21 / I | 29 / IV |
| Sent: 36 mos. | Sent: 6 mos. Probation |