IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,
                    Plaintiff,

          v.

JAMAL TURNQUEST,
                    Defendant.

CRIM. NO.
07CR000737-002


HONORABLE JUDGE ROBRENO


EMERGENCY MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO THE FIRST STEP ACT, 18 U.S.C. § 3582(C)(1)(A)(i),
AND FOR APPOINTMENT OF COUNSEL UNDER 18 U.S.C. § 3600(c)


RESPECTFULLY SUBMITTED,
BY DEFENDANT, PRO SE


12/27/20
DATE:

Jamal Turnquest
Reg. No. 43258-037
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640

## I. <u>RELIEF REQUESTED</u>

Defendant Jamal Turnquest, respectfully moves for "Emergency Motion for Compassionate Release", pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Specifically, defendant requests that the Court promptly resentence him to time served and order his release from Federal Correctional Institution Fort Dix in New Jersey. Defendant requests the Court immediately place him on home confinement, in light of The First Step Act, sentencing disparity; as well as the Covid-19 pandemic that is rapidly spreading, causing deaths within the country and particularly among those in controlled institutions, such as nursing facilities and prisons and to which defendant is acutely susceptible. Defendant's emergency motion for compassionate release can and should be heard immediately.

Defendant also request the Court to consider the deprived conditions he faces as he has been on lockdown since March of 2020, due to the pandemic.

The Defendant further request that Counsel be appointed to his case under 18 U.S.C. § 3600A(c) and that the Court consider this motion on an expedited basis as each day in custody brings renewed and substantial risk to Mr. Turnquest.

-1-

## II. __INTRODUCTION__

The Covid-19 pandemic is spreading so rapidly that, in the time it takes to rule on this motion, the facts will have changed for the worse, according to leading experts of the Center for Disease Control (CDC), and the National Institute of Health (NIH), each of which have alerted the nation that a resurgent, or second wave is forthcoming. Furthermore, The First Step Act expanded this Court's authority to reduce defendant's sentence. Defendant's Motion should be addressed immediately, as things have changed for the worst at FCI Fort Dix.

Those detained in jails and prisons face particularly grave dangers. The aforementioned experts have stated; Realistically, the best - perhaps the - only way to mitigate the damage and reduce the death toll is to decrease the jail and prison populations by releasing as many people as possible. The number of inmates infected by COVID-19 at FCI Fort Dix has dramatically increased in the past month. (see Exhibit - 1).

-2-

## III. BACKGROUND

1. DEFENDANT'S CONVICTION, INCARCERATION, AND SCHEDULED RELEASE

Defendant was charged by indictment with Conspiracy to distribute 5 kilograms or more of Cocaine and 50 grams or more of crack cocaine, in violation of 21 U.S.C.S. 846 and 841(a)(1), (b)(1)(A).  Defendant was found guilty and sentenced to a term of 264 months imprisonment to be followed by 5 years supervised release.  Mr. Turnquest is currently being held at FCI Fort Dix, which is a low security BOP facility.

Mr. Turnquest has been in Federal custody since January 7, 2008, and with prior jail credit, credit for good time, and six months halfway house, he could be released in April of 2026.

---

The Judges of this Court have written extensively about the pandemic.  Specifically how highly contagious the virus is.  See Coronavirus Disease 2019 (Covid-19), How COVID-19 Spreads, Ctrs. For Disease Control and Prevention (Apr 2, 2020) https://bit.ly/2XoiDDh.  Unfortunately, there is currently no vaccine, cure, or proven treatment that is available.  Thus far, the only way to slow the spread of the virus is to practice "social distancing."  Seer Coronavirus Disease 2019 (COVID-19), How to Protect Yourself and Others, Ctrs. For Disease Control and Prevention, https://bit.ly/3dPA8Ba

## IV. **THE FIRST STEP ACT**

The Court's authority to grant Defendant's request for Compassionate Release is governed by 18 U.S.C. § (C)(1)(A), as amended by the First Step Act of 2018.  This section allows for judicial modification of an imposed term of imprisonment when three criteria have been met:

(1) the defendant has first exhausted all administrative remedies with the BOP or at least allowed the BOP 30 days to act on his request before seeking Compassionate Release on their own motion;

(2) extraordinary and compelling reasons warrant such a reduction; and

(3) the reduction is consistent with the applicable policy statement issued by the Sentencing Commission and the Court has considered the factors set forth in section 3553(a).  18 U.S.C. § 3582(C)(1)(A)(i).

An "extraordinary and compelling reason" for the reduction can be satisfied in cases where a defendant's medical condition or overall state of health are such that they cannot be treated effectively or will worsen in a custodial environment.  To qualify, a defendant must have a medical condition, age related issue, family circumstances, or other reasons that satisfies the criteria in U.S.S.G. § 1B1.13(1)(A) and cmt.n1. and must "not be a danger to the safety of any other person or to the community." U.S.S.G. 1B1.13(2).

Before granting a motion for compassionate release, the Court must review the 3553(a) factors to the extent that they are applicable and determine the sentence reduction.

-4-

## V. EXHAUSTION OF ADMINISTRATIVE REMEDIES

Defendant has exhausted his administrative remedies by submitting a request to the Warden on or about November 16, 2020. The BOP denied the request on December 2, 2020 (see Exhibits - 2 and 3).

## VI. CURRENT CONDITIONS AT FCI FORT DIX

Fort Dix Prison is the largest prison in the FBOP and has the largest inmate population.  All of the units are at minimum 75 years old.  Showers, phones, and computers are shared between 300 plus inmates.  This coupled with an inadequate ventilation system and overcrowding can lead to more COVID-19 related deaths than any other prison in the country.

The CDC's mandate of social distancing of 6 feet is impossible to adhere to at Fort Dix due to severe overcrowding.  Giving the substantial number of inmates housed in one unit (300+), by cramming 12 inmates per room creates a cataclysmic environment for a deadly outbreak of COVID-19.  A petri dish so to say.  In a class action lawsuit filed by the ACLU seeking relief for inmates at Fort Dix, Wardern David Ortiz is quoted saying "social distancing is not possible in this environment."

Individuals "are at special risk of infection, given their living situations" and "may also be less able to participate in proactive measures to keep themselves safe."  Indeed, the tactics the CDC recommends to prevent the spread of the disease, including frequent hand washing, the use of alcohol based hand sanitizeres, social distancing, wearing face mask, and other protective gear, and frequent disinfecting of living spaces - are difficult - if not impossible for inmates incarcerated at Fort Dix.

-6-

## VII. EXTRAORDINARY AND COMPELLING REASONS

1. CHANGE IN CIRCUMSTANCES THAT COULD NOT HAVE BEEN
   FORESEEN AT THE TIME OF MR. TURNQUEST SENTENCING

The COVID-19 pandemic, its recent outbreak at FCI Fort Dix, and the dangerous conditions for its spread, now pose an extraordinary and perhaps lethal risk to Mr. Turnquest health. In the short time since September 14, in United States v. Stockton, where the Court stated zero positive cases at FCI Fort Dix, there has been an explosion of cases among inmates and staff. According to the Memorandums posted by staff[1] and the BOP's own website the number of positive cases went from "0" on September 16[2] to 232 inmates and 15 staff as of November 11, 2020. (see Exhibit - 4).

Although Mr. Turnquest stated he has no medical condition which is known to increase the severity of the virus, the mere fact of his confinement in a correctional institution experiencing an outbreak exacerbates the likelihood that he will catch the virus, which could have devastating, long lasting effects, or still possibly lead to his death.

At FCI Fort Dix, it is impossible for Mr. Turnquest to take the most basic precautions, such as social distancing. He lives in a building with over 300 inmates who all share the same bathroom, computers, and phones. He is deeply afraid that it is

-7-

only a matter of time until the virus reaches his dorm through an
infected staff member or inmate.  There is an increased chance
staff at the facility will carry the virus back to their
communities at home or - vice versa - contaminate the facility as
guards are being rotated throughout the prison.

While an initial wave of Compassionate Release applications
focused on those inmates who are elderly or have critical health
problems, policy makers and courts have recognized that the
urgent and unprecedented national emergency facing our country
requires that prison populations be reduced as much as possible,
in a manner consistent with public safety.  See e.g. Joint
Statement from Elected Prosecutors on COVID-19 and Addressing the
Rights and Needs of Those in Custody (March 25, 2020),
https://fairandjust prosecution.org/wp-
content/uploads/2020/03/coronavirus-sigh-on-1tter.pdf [add case
from circuit]

In sentencing Mr. Turnquest to 264 months imprisonment, the
Court determined that the sentence was reasonable under 18 U.S.C.
§ 3553(a).  But now, we are at a new stage, with a new set of
facts and circumstances.  We are amongst a pandemic and Mr.
Turnquest is forced to try and protect himself during an outbreak
at the facility he is housed in, which is impossible given his
living situation.  The Court did not sentence Mr. Turnquest to
suffer such consequences or death.

-8-

2. LONG TERM EFFECTS OF COVID-19

The CDC is actively working to learn more about the whole range of short- and long-term health effects associated with COVID-19. Many organs besides the lungs are affected by COVID-19 and there are many ways the infection can affect someone's health.

COVID-19 symptoms can persist for months. The virus can damage the lungs, heart and brain, which increases the risk of long-term health problems. Most people who have COVID-19 recover completely within a few weeks. But some people even those who had mild versions of the disease continue to experience symptoms after their initial recovery. These people sometimes describe themselves as "long Haulers" and the condition has been called post COVID-19 syndrome or "long COVID-19." Older people and people with many serious medical conditions are the most likely to experience lingering COVID-19 symptoms but even young, otherwise healthy people can feel unwell for weeks to months after infection. The most common signs and symptoms that linger over time include:

1. Heart - Imaging tests taken months after recovery from COVID-19 have shown lasting damage to the heart muscle, even in people who experienced only mild COVID-19 symptoms. This may increase the risk of heart failure or other heart complications in the future.

-9-

2. Lungs - The type of pneumonia often associated with COVID-19 can cause long-standing damage to the tiny air sacs (alveoli) in the lungs.  The resulting scar tissue can lead to long-term breathing problems.

3. Brain - Even in young people, COVID-19 can cause strokes, seizures and Guillain-Barre syndrome, a condition that causes temporary paralysis.  COVID-19 may also increase the risk of developing Parkinson's disease and Alzheimer's disease.  Blood clots and blood vessel problems.  COVID-19 can make blood cells more likely to clump up and form clots.  While large clots can cause heart attacks and strokes, much of the heart damage caused by COVID-19 is believed to stem from very small clots that block tiny blood vessels (capillaries) in the heart muscle.

Other parts of the body affected by blood clots include the lungs, legs, liver and kidneys.  COVID-19 can also weaken blood and cause them to leak, which contributes to potentially long-lasting problems with the liver and kidneys.

Many people who have recovered from SARS have gone on to develop chronic fatigue syndrome, a complex disorder characterized by extreme fatigue that worsens with physical or

-10-

mental activity, but doesn't improve with rest.  People who have severe symptoms of COVID-19 often have to be treated in a hospital's intensive care unit, with mechanical assistance such as ventilators to breath.  Simply surviving the experience can make a person more likely to later develop post traumatic stress syndrome, depression and anxiety.

Most people who have COVID-19 recover quickly.  But the potentially long lasting problems from COVID-19 make it even more important to reduce the spread of the disease by following precautions by the CDC such as wearing masks, social distancing, and avoiding crowds and confined or poorly ventilated spaces. The long lasting effects of COVID-19 on a healthy person is an extraordinary and compelling reason to grant Compassionate Release.

3. SENTENCING DISPARITY PERCEIVED BETWEEN MR. TURNQUEST AND OTHER
   DEFENDANTS ELIGIBLE FOR AMENDMENT 782 (minus two level for
   drug quantity table).

        Amendment 782, which went into effect on November 1,

2015, and has been applied retroactively, generated a two level

reduction for all base levels found in the drug quantity tables

in Sections 2D1.1 and 2D1.11 of the Guidelines.


        The Guidelines also provides specific instructions for a

Court when determining whether a sentence reduction is

warrranted. § 1B1.10(b)(1).  Section 1B1.10(b)(1) instructs that

"the Court shall determine the amended guideline range that would

have been applicable to the defendant if the amendment...had been

in effect at the time the defendant was sentenced...substituting

only the amendment...for the corresponding guideline provision

that [was] applied" but leaving all other guideline application

decisions unaffected." Mr. Turnquest was sentenced to a level

41, but was also credited goodtime credit from the time he was

locked up in state prison - for a sentence of 264 months.


        Here, Mr. Turnquest sentence should be reduced in light

of Amendment 782.  Application of Amendment 782 in the present

case results in a decrease of the total offense by two levels,

from level 41 to level 39.  Leaving all other guideline

applications unaffected and applying the same downward varience

at the original sentencing would produce a sentence of

approximately 210 months.

                              -12-

4. REHABILITATION

"Rehabilitation of the Defendant alone shall not be considered" sufficiently extraordinary and compelling to justify compassionate release see § 994(t).

A. CONGRESS INTENT

The language of a "statute should be construed to give effect to all its provisions. The Word "alone" allows courts to consider rehabilitation as a part of a compassionate release motion. Thus, several Courts have found a defendant's rehabilitation to be part of the extraordinary and compelling reasons favoring release. Therefore, Mr. Turnquest request the court consider his Rehabilitation as a reason justifying Compassionate Release.

To start, Mr. Turnquest has completed over 18 educational courses including the non residential Drug Program (see Exhibit - 9). Mr. Turnquest has continuously programmed and has maintained employment during his incarceration. During the last two years he has maintained an exemplary prison record. This record is not indicative of someone who currently presents a danger to society. Upon release Mr. Turnquest will remain law-abidingd.

-13-

5. GOOD TIME CREDIT

Mr. Turnquest has approximately 3 years and 10 months of Jail Credit that was never credited to his sentence.  Mr. Turner Computation Sheet (Exhibit - 5) incorrectly shows the computation on his sentence began on November 7, 2011.  Mr. Turnquest Administrative Release History (kindly refer to Exhibit - 6) unequivocally shows Mr. Turnquest came into Federal custody on January 7, 2008 and remained until October 4, 2010, where he was designated and assigned to FCI Allenwood.  On December 13, 2010, Mr. Turnquest was released on a Federal Writ back to the state.  On or about November 10, 2011, Mr. Turnquest was released back into Federal Custody. The computation sheet (Exhibit - 5) shows that Mr. Turnquest was given 14 days of jail credit in 2006, but fails to credit any time between October 30, 2006 and November 7, 2011 (the date the computation sheet say the computation began.  This fact alone should cause concern as the computation sheet displays a hug gap of time that was not credited to Mr. Turnquest sentence (from 10-30-2006 to 11-07-2011).  Therefore, crediting Mr. Turnquest sentence 3 years and 10 months merits Compassionate Release.

-14-

6. DEPRIVED CONDITIONS SUFFERED DURING INCARCERATION

Mr. Turnquest also had to endure misery as he has been deprived during his incarceration since March of 2020 when Fort Dix went into lockdown status because of the pandemic. Since March of 2020 Mr. Turnquest suffered as he has been deprived of Visits, Movement, Commissary, Recreation, Programming, Medical. Education. Work Detail, COVID-19 testing, not to mention the fear and anxiety of being infected by the COVID-19 virus.

"A day spent in prison under extreme lockdown and legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing." See United States v. Rodriguez, No. 00Cr.761-2(JSR), 2020 WL 5810161, at 3 (S.D.N.Y. Sept. 30, 2020) ("The pandemic, aside from posing a threat to [a defendant's] health, has made [a defendant's] incarceration harsher and more punitive that would otherwise have been the case. This is because the federal prisons, as 'prime candidates' for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal." (citation omitted)).

-15-

Mr. Turnquest would like the Court to consider the past nine months in which he has experienced heightened deprivation and to have experienced unexpectedly punishing conditions spent in prison to offset the need for him, in order to assure just punishment, to serve the next 15 months in prison, as opposed to in a less restrictive confinement where he can social distance and protect himself during the COVID-19 pandemic. Given the present circumstances releasing Mr. Turnquest before his scheduled release date would be consistent with the sentencing imperatives. The Public no longer needs to be protected from Mr. Turnquest.

Furthermore, Mr. Turnquest incarceration in the midst of a global pandemic "has increased the severity of the sentence beyond what was originally anticipated." The deprived conditions Mr. Turnquest faced since March of 2020 are extraordinary and compelling to warrant Compassionate Release. See United States v. Lizardi, 11Cr.1032-55(PAE) (decided October 9, 2020) attached hereto as Exhibit - 7.

-16-

## 3553 FACTORS

1. 3553 FACTORS IN 18 U.S.C. 3553(a) WEIGH IN FAVOR IN GRANTING MR.
WILSON'S MOTION FOR COMPASSIONATE RELEASE.

Mr. Turnquest was 22 years old when he  caught this case and has
already been incarcerated 14 years.  He has matured considerably during
this time and has programmed extensively.  He has maintained steady
employment during his incarceration working at UNICOR for 4 years
straight from 6-19-2014 until 2-28-2018 (see Exhibit - 8).  Within the
past two years he has maintained a discipline free record and had
channelled his energy in a positive direction.  Being incarcerated at a
low custody facility demonstrates the public will not need to be
protected from him now or when he is scheduled to be released.


Mr. Turnquest has guaranteed employment once he is released and
strong family support.  His family will provide housing, financial
assistance, and medical coverage if needed.  Thereby, significantly
lowering Mr. Turnquest chances of recidivism.


There also exist a peculiar and unwarranted sentencing disparity
between Mr. Turnquest and defendants who sentence was reduced 2 levels
pursuant to Amendment 782, a two level reduction in Mr. Turnquest
sentence would alleviate this disparity.


To release Mr. Turnquest now this Court would have to reduce his
sentence to approximately 10 years less.  However, taking into account
the 2 level reduction for Amend 782 and prior jail credit of 3 years and

-17-

10 months, combined with, the RDAP Program and halfway house, Mr. Turnquest would have less than 4 years left on his sentence.

The nature of this unprecedented Pandemic, the lack of social distancing where Mr. Turnquest is incarcerated, the deprived conditions he has faced since March of 2020, and the long term effects COVID-19 has on a healthy person favor in granting Mr. Turnquest motion for compassionate release.

Therefore, Mr. Turnquest request this Court sentence him to time served - followed by 5 years home confinement - to be followed by 5 years supervised release, or any relief the Court deems just and proper

-18-

## RELEASE PLAN

Upon release Mr. Turnquest's mother (Crystal Long) will pick him up from FCI Fort Dix and drive him directly to 507 Highland Ct., Wayne, PA 19087, where a room is designated for him to self quarantine. Mr. Turnquest will self quarantine at this address as long as necessary to ensure the health and safety of himself and others.

Mr. Turnquest already has promised employment with Crawfords Cleaning Service (#877-267-3075). He also plans to apply for the Federal Re-entry Corp Program to continue his education and reduce his risk of recidivism.

Mr. Turnquest wife and family will also help him avoid recidivism and continue his rehabilitation as they will take care of all financial obligations that will incur upon Mr. Turnquest release.

For the foregoing reasons, Mr. Turnquest respectfully urge the Court to grant his motion for Compassionate Release.

RESPECTFULLY SUBMITTED,
BY THE DEFENDANT, PRO SE

DATE: 12/27/20

Jamal Turnquest
Reg. No. 43258-037
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640

-19-

EXHIBIT -- 1

# Congress of the United States
## Washington, DC 20515

November 9, 2020

Mr. Michael Carvajal
Director
Federal Bureau of Prisons
320 First Street N.W.
Washington, DC 20534

Dear Mr. Carvajal,

We write today to express grave concerns regarding the Bureau of Prison's (BOP's) inadequate protocols for COVID-19 testing and transfers of incarcerated individuals. Specifically, we are concerned that BOP recently transferred COVID-19 positive incarcerated individuals to FCI Fort Dix, which is now facing a second, and potentially severe, COVID-19 outbreak. We strongly urge you to extend the recently enacted moratorium on transferring incarcerated individuals to FCI Fort Dix to also cover FCI Fairton, and that you continue the moratorium until BOP eradicates the new COVID-19 outbreak at the facility and formulates an effective and accurate testing strategy to protect both staff and incarcerated individuals from future outbreaks.

Prior to October, BOP had not reported any recent COVID-19 cases among incarcerated individuals or staff at FCI Fort Dix. However, in early October, BOP reportedly alerted staff at FCI Fort Dix that their facility would begin receiving transfers of incarcerated individuals from FCI Elkton in Ohio. FCI Elkton has been severely affected by COVID-19, with nearly 1,000 known cases among incarcerated individuals and staff to date.[1] Despite the known risks of transferring incarcerated individuals during a pandemic,[2] BOP transferred more than 150 incarcerated individuals from FCI Elkton to FCI Fort Dix in recent weeks. On October 28, 2020, BOP confirmed in an email to congressional staff that 54 incarcerated individuals tested positive for COVID-19 in the 5812 unit of FCI Fort Dix, which is reportedly the unit into which the individuals from FCI Elkton were transferred. On October 29, 2020, BOP confirmed that five incarcerated individuals from FCI Elkton who were transferred to FCI Fort Dix on the evening of October 28, 2020 had rapid-tested positive for COVID-19 upon arrival and were placed in isolation.

While the situation is rapidly evolving, it is clear that BOP does not have an effective plan to ensure COVID-19 positive incarcerated individuals are not transferred between facilities. The outbreak is now spreading within FCI Fort Dix, and as of November 9, 2020, there are at least 228 active COVID-19 cases among incarcerated individuals and ten active COVID-19 cases among staff members.[3] The FCI Fort Dix employees responsible for transporting the FCI Fort Elkton transfers may have been exposed to COVID-19 in transit. All incarcerated individuals and

---

[1] https://www.bop.gov/coronavirus/
[2] https://www.bop.gov/coronavirus/covid19_status.jsp
[3] https://www.bop.gov/coronavirus/

staff at FCI Fort Dix and the surrounding communities are now at increased risk for contracting COVID-19, with potentially deadly consequences.

In light of the rapidly escalating crisis at FCI Fort Dix, we urge you to immediately test all FCI Fort Dix incarcerated individuals and staff for COVID-19. We appreciate that BOP has instituted a temporary moratorium on transfers into FCI Fort Dix until November 23, 2020. However, rather than using an arbitrary date, we urge BOP to halt all transfers to FCI Fort Dix until BOP institutes an effective and accurate testing strategy for incarcerated individuals and staff and there are no active cases at the facility. Given that BOP does not currently have an effective strategy for safely transferring incarcerated individuals, we also request that BOP extend this moratorium to New Jersey's other facility, FCI Fairton.

In regards to an effective COVID-19 testing strategy, we strongly urge you to institute a plan to test all FCI Fort Dix incarcerated individuals and staff on at least a biweekly basis. FCI Fort Dix's employees are frontline federal workers, and it is unacceptable that BOP is not providing them with regular COVID-19 testing. By failing to test FCI Fort Dix's employees, BOP is needlessly endangering not only these employees but their families, all incarcerated individuals, and the entire surrounding community.

Additionally, we request that BOP provide detailed answers to the following questions no later than Friday, November 20, 2020:

1) Will BOP commit to halting all transfers of incarcerated individuals to FCI Fort Dix and FCI Fairton until the current COVID-19 outbreak at the facility has ended and there are no active cases among incarcerated individuals or staff?
2) During the FCI Fort Dix transfer moratorium, will BOP also commit to halting any transfers of incarcerated individuals to FCI Fairton?
3) What is BOP's plan for addressing the current COVID-19 outbreak at FCI Fort Dix, including information on testing, safety protocols, notifications to staff and incarcerated individuals, as well as any future outbreaks at FCI Fort Dix and ensuring the safety of both incarcerated individuals and staff?
4) In an email to congressional staff, BOP indicated that incarcerated individuals who had tested positive for COVID-19 in the previous 90 days and were asymptomatic were not retested before being transferred from FCI Elkton to FCI Fort Dix. Can you verify that all FCI Elkton incarcerated individuals who previously tested positive for COVID-19 received two negative COVID-19 test results before their transfer to FCI Fort Dix? Please describe, in detail, the process for testing the FCI Elkton incarcerated individuals prior to their transfer to FCI Fort Dix.
5) What is BOP's overall, long-term COVID-19 testing strategy for FCI Fort Dix? How will BOP update the COVID-19 testing strategy at FCI Fort Dix in light of the recent outbreak?
6) Will BOP begin providing COVID-19 testing to FCI Fort Dix employees? If so, how often will such testing occur?
7) How has FCI Fort Dix spent the CARES Act (P.L. 116-136) funding that has been allocated the facility? Please provide a detailed breakdown.

Thank you for your prompt consideration of this urgent matter.

Sincerely,

Robert Menendez
United States Senator

Cory A. Booker
United States Senator

Frank Pallone, Jr.
Member of Congress

Bill Pascrell, Jr.
Member of Congress

Albio Sires
Member of Congress

Donald M. Payne, Jr.
Member of Congress

Donald Norcross
Member of Congress

Bonnie Watson Coleman
Member of Congress

Josh Gottheimer
Member of Congress

Mikie Sherrill
Member of Congress

Andy Kim
Member of Congress

Tom Malinowski
Member of Congress

E X H I B I T -- 2

November 16, 2020

TO: David Ortiz, Warden FCI Fort Dix
    FCI Fort Dix
    P.O. Box 38
    Joint Base MDL, NJ 08640


FROM: Jamal Turnquest
      Reg. No. 43258-037
      FCI Fort Dix
      P.O. Box 2000
      Joint Base MDL, NJ 08640


RE: Request for Compassionate Release, Pursuant to the First Step
    Act.

    Dear Warden Ortiz,

        I'm seeking Compassionate Release under the First Step Act
    based on the following extraordinary and compelling
    circumstances:

        1. The Covid-19 pandemic/outbreak at (FCI Fort Dix).

        2. Deprived Living Conditions.

        3. Sentencing Disparity.

        Based on Compassionate Release pursuant to 18 U.S.C. §
    3582(C)(1)(A)(i), I believe compelling and extraordinary
    circumstances exist (Prison outbreak of COVID-19) to warrant a
    reduction in sentence and/or placed on home confinement.

        I request that the BOP move my sentencing court for
    compassionate release or placement on home confinement under 18
    U.S.C. § 3582 and/or place me on home confinement under the CARES
    ACT and BOP policy.  This action is necessary because of the risk
    that I face from a COVID-19 outbreak here at FCI Fort Dix.

        I am a non-violent offender and have made every effort to
    educate myself while incarcerated, including successfully
    completing (e.g. drug abuse treatment and education programs.  If
    released or placed in home confinement, I will be picked up by my
    wife (Ms. Shannon Nash) or my mother (Crystal Long), and will
    reside with my mother at her home 507 Highland Ct. Wayne, PA
    19087.  I will self quarantine at this address in a room
    designated for me for the required time period.  I have strong
    family support and can rely on them for support and assistance
    while on home confinement.

DATE: 11/16/20                                    Jamal Turnquest

EXHIBIT -- 3

Turnquest, Jamal
Register Number: 43258-037
Unit: 5702 (A)

## INMATE REQUEST TO STAFF RESPONSE

This is in response to your request for consideration for Compassionate Release/Reduction in Sentence (RIS) in accordance with 18 U.S.C. §3582(c)(1)(A) and Program Statement 5050.50, Compassionate Release/Reduction in Sentence, Procedures for Implementation, 18 U.S.C. §3582(c)(1)(A) and §4205(g).

In accordance with Program Statement 5050.50, Compassionate Release/Reduction in Sentence, Procedures for Implementation, 18 U.S.C. §3582(c)(1)(A) and §4205(g), an inmate may initiate a request for consideration only when there are particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing.

Title 18 of the United States Code, section §3582(c)(1)(A), allows a sentencing court, on motion of the Director of the BOP, to reduce a term of imprisonment for extraordinary or compelling reasons. The BOP has interpreted the extraordinary and compelling circumstances in a number of categories outlined in policy. BOP Program Statement No. 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §3582(c)(1)(A) and §4205(g), provides guidance on the types of circumstances that present extraordinary or compelling reasons, such as the inmate's terminal medical condition; debilitated medical condition; status as a "new law" elderly inmate, an elderly inmate with medical conditions, or an "other elderly inmate"; the death or incapacitation of the family member caregiver of the inmate's child; or the incapacitation of the inmate's spouse or registered partner.

If you still wish to be considered for Compassionate Release/RIS, please re-submit your request with the one specific category, along with a detailed release plan (medical, employment, financial).


_____                    ___12-2-2020___
R. Robinson                              Date
R.I.S. Coordinator



E X H I B I T -- 4

U.S. Department of Justice
Federal Bureau of Prisons
Federal Correctional Institution
P.O. Box 38
JBMDL, New Jersey 08640

October 9, 2020

MEMORANDUM FOR INMATE POPULATION

FROM:          LCDR Ronell Copeland, RN, QIICN

SUBJECT:       COVID-19 Update

Please be advised, there are currently inmates at FCI Fort Dix who tested positive for COVID-19 and have been placed in isolation.

Continue to observe infection prevention and control measures including maintaining social distancing, sanitizing high touched surfaces, frequent handwashing, avoid touching your eyes, nose and mouth. Also, be sure to cover your cough using a tissue and immediately dispose of the used tissue. Report the following symptoms to health services: fever, cough, shortness of breath, new-onset trouble speaking/difficulty breathing/loss of taste or smell, fatigue, muscle or body aches, sore throat, stuffy/runny nose and GI upset. Finally, it is mandatory that you wear your face covering provided by staff.

Be assured, all inmates being treated for COVID-19 will not be returned to general population until they are medically cleared.

COVID-19 is a respiratory illness spread from person to person through the respiratory droplets of an infected person.  There is no vaccine or antiviral medication to treat this disease therefore, prevention is key.



U.S. Department of Justice
Federal Bureau of Prisons
Federal Correctional Institution
P.O. Box 38
Joint Base MDL, New Jersey 08640

October 26, 2020

MEMORANDUM TO INMATE POPULATION

FROM:    LCDR Ronell Copeland, RN, QIICN

SUBJECT: Notice to Inmate Population

Please be advised, 54 confirmed cases of COVID-19 identified in unit
5812 have been isolated in unit 5851, 2nd floor. A confirmed case of
COVID-19 identified in SHU is being isolated in Health Services, West
Compound.

For Information Purposes:

The virus called Coronavirus (COVID-19), probably emerged from an
animal source, is a respiratory disease which spread from person to
person via respiratory droplets when an infected person sneezes or
coughs. Symptoms including fever, cough, shortness of breath, new-
onset trouble speaking/loss of taste or smell, fatigue, muscle or
body aches, sore throat, and stuffy/runny nose, which may occur
within 2 to 14 days of exposure. There is no vaccine or antiviral
medications to treat this disease, prevention is key.



EXHIBIT -- 5

```
ALFB6   540*23 *              SENTENCE MONITORING         *      02-16-2016
PAGE 001        *              COMPUTATION DATA            *      09:33:56
                                AS OF 02-16-2016


REGNO..: 43258-037 NAME: TURNQUEST, JAMAL


FBI NO............: 434586XB1          DATE OF BIRTH: 03-29-1984  AGE:   31
ARS1.............: ALF/A-DES
UNIT.............: BRADY                QUARTERS....: B05-141L
DETAINERS........: NO                   NOTIFICATIONS: NO

HOME DETENTION ELIGIBILITY DATE: 08-07-2030

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE:  02-07-2031 VIA GCT REL


-------------------CURRENT JUDGMENT/WARRANT NO: 010 ------------------------

COURT OF JURISDICTION..........: PENNSYLVANIA, EASTERN DISTRICT
DOCKET NUMBER..................: DPAE2:07CR000737-002
JUDGE..........................: ROBRENO
DATE SENTENCED/PROBATION IMPOSED: 08-10-2010
DATE COMMITTED.................: 10-04-2010
HOW COMMITTED..................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED..............: NO

                 FELONY ASSESS  MISDMNR ASSESS  FINES        COSTS
NON-COMMITTED.:  $100.00        $00.00          $1,000.00    $00.00

RESTITUTION...:   PROPERTY:  NO  SERVICES:  NO      AMOUNT:  $00.00

-------------------CURRENT OBLIGATION NO: 010 ------------------------
OFFENSE CODE...: 409
OFF/CHG: 21:846&841(A)(1)(A) CONSP TO DIST 5KGS OR MORE OF COCAINE AND
         50GS OR MORE OF COCAINE BASE "CRACK".

 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:   264 MONTHS
 TERM OF SUPERVISION............:     5 YEARS
 DATE OF OFFENSE................: 09-01-2007




G0002        MORE PAGES TO FOLLOW . . .
```

```
     ALFB6   540*23 *              SENTENCE MONITORING         *      02-16-2016
     PAGE 002           *          COMPUTATION DATA            *      09:33:56
                                   AS OF 02-16-2016

     REGNO..: 43258-037 NAME: TURNQUEST, JAMAL


     ------------------------CURRENT COMPUTATION NO: 010 ------------------------

     COMPUTATION 010 WAS LAST UPDATED ON 11-30-2011 AT DSC AUTOMATICALLY
     COMPUTATION CERTIFIED ON 11-30-2011 BY DESIG/SENTENCE COMPUTATION CTR

     THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
     CURRENT COMPUTATION 010: 010 010

     DATE COMPUTATION BEGAN............: 11-07-2011
     TOTAL TERM IN EFFECT..............: 264 MONTHS
     TOTAL TERM IN EFFECT CONVERTED..:   22 YEARS
     EARLIEST DATE OF OFFENSE........: 09-01-2007

     JAIL CREDIT.....................:   FROM DATE      THRU DATE
                                         08-24-2006     08-24-2006
                                         10-17-2006     10-30-2006

     TOTAL PRIOR CREDIT TIME..........: 15
     TOTAL INOPERATIVE TIME...........: 0
     TOTAL GCT EARNED AND PROJECTED..: 988
     TOTAL GCT EARNED.................: 162
     STATUTORY RELEASE DATE PROJECTED: 02-07-2031
     EXPIRATION FULL TERM DATE.......: 10-22-2033
     TIME SERVED.....................:     4 YEARS      3 MONTHS      25 DAYS
     PERCENTAGE OF FULL TERM SERVED..: 19.6

     PROJECTED SATISFACTION DATE.....: 02-07-2031
     PROJECTED SATISFACTION METHOD...: GCT REL




     G0002         MORE PAGES TO FOLLOW . . .
```

EXHIBIT -- 6

```
FTDOD  531.01 *          INMATE HISTORY          *    05-23-2019
PAGE 001 OF 001 *           ADM-REL             *    12:55:17

REG NO..: 43258-037 NAME....: TURNQUEST, JAMAL
CATEGORY: ARS          FUNCTION: PRT        FORMAT:
```

| FCL | ASSIGNMENT | DESCRIPTION | START DATE/TIME | STOP DATE/TIME |
|---|---|---|---|---|
| FTD | A-DES | DESIGNATED, AT ASSIGNED FACIL | 05-15-2018 1455 | CURRENT |
| B15 | RELEASE | RELEASED FROM IN-TRANSIT FACL | 05-15-2018 1455 | 05-15-2018 1455 |
| B15 | A-ADMIT | ADMITTED TO AN IN-TRANSIT FACL | 05-15-2018 1330 | 05-15-2018 1455 |
| BRO | HLD REMOVE | HOLDOVER REMOVED | 05-15-2018 1330 | 05-15-2018 1330 |
| BRO | A-BOP HLD | HOLDOVER FOR INST TO INST TRF | 05-09-2018 0153 | 05-15-2018 1330 |
| B01 | RELEASE | RELEASED FROM IN-TRANSIT FACL | 05-09-2018 0153 | 05-09-2018 0153 |
| B01 | A-ADMIT | ADMITTED TO AN IN-TRANSIT FACL | 05-08-2018 2159 | 05-09-2018 0153 |
| CAA | HLD REMOVE | HOLDOVER REMOVED | 05-08-2018 2159 | 05-08-2018 2159 |
| CAA | A-HLD | HOLDOVER, TEMPORARILY HOUSED | 04-18-2018 0208 | 05-08-2018 2159 |
| B02 | RELEASE | RELEASED FROM IN-TRANSIT FACL | 04-18-2018 0208 | 04-18-2018 0208 |
| B02 | A-ADMIT | ADMITTED TO AN IN-TRANSIT FACL | 04-17-2018 2235 | 04-18-2018 0208 |
| CAA | HLD REMOVE | HOLDOVER REMOVED | 04-17-2018 2235 | 04-17-2018 2235 |
| CAA | A-BOP HLD | HOLDOVER FOR INST TO INST TRF | 04-05-2018 1000 | 04-17-2018 2235 |
| B01 | RELEASE | RELEASED FROM IN-TRANSIT FACL | 04-05-2018 1000 | 04-05-2018 1000 |
| B01 | A-ADMIT | ADMITTED TO AN IN-TRANSIT FACL | 04-05-2018 0717 | 04-05-2018 1000 |
| ALF | TRANSFER | TRANSFER | 04-05-2018 0717 | 04-05-2018 0717 |
| ALF | A-DES | DESIGNATED, AT ASSIGNED FACIL | 09-28-2016 1425 | 04-05-2018 0717 |
| ALF | LOCAL HOSP | ESC TRIP TO LOCAL HOSP W/RETN | 09-28-2016 0709 | 09-28-2016 1425 |
| ALF | A-DES | DESIGNATED, AT ASSIGNED FACIL | 11-28-2011 1848 | 09-28-2016 0709 |
| 9-L | RELEASE | RELEASED FROM IN-TRANSIT FACL | 11-28-2011 1848 | 11-28-2011 1848 |
| 9-L | A-ADMIT | ADMITTED TO AN IN-TRANSIT FACL | 11-10-2011 0938 | 11-28-2011 1848 |
| DSC | ADMIN REL | ADMINISTRATIVE RELEASE | 11-10-2011 0838 | 11-10-2011 0838 |
| DSC | A-ADMIN | ADMINISTRATIVE ADMISSION | 11-10-2011 0836 | 11-10-2011 0838 |
| ALF | STATE PRIS | STATE PRISONER REMOVED | 12-13-2010 0950 | 11-10-2011 0836 |
| ALF | A-REL CHNG | ADMISSION FOR RELEASE CHANGE | 12-13-2010 0946 | 12-13-2010 0950 |
| 5-R | RELEASE | RELEASED FROM IN-TRANSIT FACL | 12-13-2010 0946 | 12-13-2010 0946 |
| 5-R | A-ADMIT | ADMITTED TO AN IN-TRANSIT FACL | 12-13-2010 0616 | 12-13-2010 0946 |
| ALF | FED WRIT | RELEASE ON FEDERAL WRIT | 12-13-2010 0616 | 12-13-2010 0946 |
| ALF | A-DES | DESIGNATED, AT ASSIGNED FACIL | 10-04-2010 1902 | 12-13-2010 0616 |
| B15 | RELEASE | RELEASED FROM IN-TRANSIT FACL | 10-04-2010 1902 | 10-04-2010 1902 |
| B15 | A-ADMIT | ADMITTED TO AN IN-TRANSIT FACL | 10-04-2010 0706 | 10-04-2010 1902 |
| PHL | HLD REMOVE | HOLDOVER REMOVED | 10-04-2010 0706 | 10-04-2010 0706 |
| PHL | A-HLD | HOLDOVER, TEMPORARILY HOUSED | 07-13-2009 0916 | 10-04-2010 0706 |
| PHL | ADM CHANGE | RELEASE FOR ADMISSION CHANGE | 07-13-2009 0913 | 07-13-2009 0916 |
| PHL | A-PRE | PRE-SENT ADMIT, ADULT | 01-07-2008 1910 | 07-13-2009 0913 |

```
G0000       TRANSACTION SUCCESSFULLY COMPLETED
```

EXHIBIT -- 7

11 Cr. 1032-55 (PAE)

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

# United States v. Lizardi

Decided Oct 9, 2020

11 Cr. 1032-55 (PAE)

10-09-2020

UNITED STATES OF AMERICA, v. RAMON LIZARDI, Defendant.

PAUL A. ENGELMAYER, District Judge

# OPINION & ORDER

:

The Court has received a request from defendant Ramon Lizardi seeking his release from Fort Dix Federal Correctional Institution ("Fort Dix FCI") pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), in light of the risk that the COVID-19 pandemic presents for inmates. *See* Dkt. 2513 ("Def. Ltr."); Dkt. 2519 ("Def. Mem."); *see also* Dkt. 2521 ("Def. Reply"). The Government opposes this request. *See* Dkt. 2520 ("Gov't Mem."); *see also* Dkt. 2522 ("Gov't Ltr."). For the following reasons, the Court grants this application.

Lizardi was a member of the Bad Boys, a sect of the Bronx Trinitarios Gang ("BTG"), between 2004 and 2006. Gov't Mem. at 1; Dkt. 1600 ("Sent. Tr.") at 34. As a member of the Bad Boys, Lizardi participated, in a secondary role, in the murder of Miguel Perez. On December 11, 2005, Lizardi and other Bad Boy members went to 187th Street and Marion Avenue, looking to retaliate against a member of their rival gang, the Dominicans Don't Play ("DDPs"), for a murder of a Bad Boy committed by the DDPs. One of Lizardi's fellow Bad Boy members shot Perez in the head while Lizardi was present. While in the BTG, Lizardi also took part in other violent disputes with rival gangs, in which he was armed with a knife. Gov't Memo. at 1; Sent. Tr. at 34-35. [2]

On April 16, 2014, Lizardi pled guilty to participating in a racketeering conspiracy in connection with his membership in the BTG. Dkt. 1107. On December 17, 2014, the Court sentenced Lizardi to 121 months' imprisonment, at the bottom of the advisory guideline range of between 121 and 151 months' imprisonment. The Court recognized aggravating factors, primarily the seriousness of Lizardi's offenses, and in particular his support role in the Perez murder. Sent. Tr. at 37. At the same time, the Court noted that, in the five years before he was prosecuted, Lizardi had renounced his gang affiliation and lived peaceably. *Id.* at 21-22, 31, 39-41. The Court then determined that, in light of these facts, and in particular the reduced need for incapacitation and specific deterrence given Lizardi's demonstrated renunciation of the BTG years before he was prosecuted, a sentence at the bottom of the guideline range, and not higher, was warranted. *Id.* at 39, 45.

Lizardi has been incarcerated since his arrest on January 16, 2013. He has served nearly 93 months of his 121-month sentence. Def. Mem. at 1. Lizardi's counsel represents that, with expected credit for good time, Lizardi is currently scheduled to be released on September 11, 2021, less than 11 months from now. *Id.* at 1-2. Lizardi has

2

also been told by his case manager that he will be released to a halfway house on March 15, 2021. *Id.* at 2. The Government does not dispute these calculations, including that Lizardi is on track to be released from prison in a little over five months.

On August 26, 2020, the Court received a motion from Lizardi seeking early release in light of the COVID-19 pandemic. *See* Def. Ltr. On August 27, 2020, the Court reappointed Lizardi's trial counsel, Florian Miedel, Esq. and Russell T. Neufeld, Esq., for the limited purpose of submitting a memorandum of law in support of his application for compassionate release. Dkt. 2514. On September 25, 2020, Lizardi's counsel filed such a memorandum, arguing that \*3 release is warranted on account of the pandemic, the fact that Lizardi has served almost his entire sentence and will soon be released to a halfway house, Lizardi's efforts at rehabilitation, and the lack of a need for incarceration to protect the public. *See* Def. Mem. On September 30, 2020, the Government opposed Lizardi's motion. It argues that there are not compelling and extraordinary reasons supporting release because Lizardi is a healthy 34-year-old man who does not face a heightened risk from COVID-19, and because, in its view, early release is unsupported by the sentencing factors set out in 18 U.S.C. § 3553(a). On October 1, 2020, Lizardi's counsel filed a reply, arguing that the conditions of Lizardi's confinement present heightened risks of infection and that the § 3553(a) factors are compatible with release, particularly given the harsh conditions of confinement that Lizardi has experienced since March 2020, when the pandemic struck. Def. Reply. On October 2, 2020, the Government filed a letter, contesting defense counsel's tabulation of the number of current cases of COVID-19 at Fort Dix FCI. Gov't Ltr.

Under 18 U.S.C. § 3582(c)(1)(A), a court:

> upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that— (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

The defendant bears of the burden of proving that he is entitled to compassionate release under 18 U.S.C. § 3582(c). *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); *United States v. Clarke*, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at \*1 (S.D.N.Y. Oct. 29, 2010). \*4

Originally, § 3582(c)(1)(A) did not permit prisoners to initiate compassionate release proceedings, and instead required the BOP to seek such release on their behalf. *United States v. Ebbers*, 432 F. Supp. 3d 421, 422-23, 427 (S.D.N.Y. 2020). However, with the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, Congress amended the law to allow defendants independently to seek compassionate release relief from federal courts. *Ebbers*, 432 F. Supp. 3d at 422-23.

The Second Circuit has recently clarified the regulatory guidance applicable to § 3582(c) applications made by defendants. Before the First Step Act, Congress had tasked the Sentencing Commission with identifying circumstances that are sufficiently extraordinary and compelling to justify a reduction in sentence. *Id.* at 427 (citing 28 U.S.C. § 994(t)). The Commission did so in U.S.S.G. § 1B1.13 and its corresponding commentary. That guidance, *inter alia*, (1) sets out various circumstances that present extraordinary and compelling reasons justifying release; and (2) requires that a defendant not be a danger to the community. *Id.* § 1B1.13(1)-(3) & cmt. n.1(A)-(D).

By its terms, however, the Commission's guidance applies only to a "motion of the Director of the Bureau of Prisons," *id.* § 1B1.13; the Commission has not updated § 1B1.13 or its commentary to reflect the First Step Act's amendment to § 3582(c)(1)(A) authorizing defendants to move for compassionate release on their own. Accordingly, although courts, including this one, had heretofore widely treated the Commission's guidance as applicable to all compassionate release motions, *see, e.g., United States v. Hernandez*, 451 F. Supp. 3d 301, 303 (S.D.N.Y. 2020); *see also Ebbers*, 432 F. Supp. 3d at 428, the Second Circuit has recently clarified that § 1B1.13 "is not applicable' to compassionate release motions brought by defendants," rather than by the BOP, and "cannot constrain district courts' discretion to consider whether any reasons are *5 extraordinary and compelling" in such cases. *United States v. Brooker*, No. 19-3218, 2020 WL 5739712, at *6 (2d Cir. Sept. 25, 2020); *see also id.* at *7 ("Neither Application Note 1(D), *nor anything else in the now-outdated version of Guideline § 1B1.13*, limits the district court's discretion." (emphasis added)).

Consistent with *Brooker,* in assessing a § 3582(c) motion brought directly by a defendant, the Court is not constrained by either § 1B1.13's enumeration of extraordinary and compelling reasons, or its freestanding requirement that the defendant seeking release not pose any danger to the community. Rather, the Court, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," 18 U.S.C. § 3582(c)(1)(A)(i), may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it] in motions for compassionate release." *Brooker,* 2020 WL 5739712, at *7.

In this case, consideration of the 18 U.S.C. § 3553(a) factors favor the slight expedition (by five months) of Lizardi's release date, into a federal halfway house, that his § 3582(c) motion seeks. Significant here, Lizardi is the rare violent-gang defendant as to whom the § 3553(a) factor requiring that a sentence "protect the public from further crimes of the defendant" does not demonstrably require long incarceration. As this Court explained at Lizardi's 2014 sentencing, his "situation is unusual in that [his] criminal record stops after 2006." Sent. Tr. at 38-39. The Court there noted that, as reflected in Lizardi's renunciation of the BTG and criminal activity five years before the charges in this case were filed, Lizardi had demonstrably "turned away from crime from that point forward . . . [He] gained maturity and turned over a new leaf." *Id.* at 39. That fact, the Court explained at sentencing, "significantly mitigates the need for specific deterrence" and created no more than a "modest" need for Lizardi's incapacitation in the interest of public protection. *Id.* Consistent with the Court's assessment at sentencing, these § 3553(a) *6 factors do not require that Lizardi spend the next five months at Fort Dix FCI before his release to a halfway house. Lizardi's release now, five months ahead of schedule, into the less restrictive environment of a halfway house, leaves the public adequately protected.

The principal bases on which the Court determined in 2014 that a 121-month sentence was necessary were to assure that Lizardi's sentence reflected the seriousness of his offense, to promote respect for the law, and to provide just punishment. Those factors remain as weighty as at the time of sentencing. However, Lizardi's term in custody has proven more arduous than the Court—or anyone—could ever have anticipated in 2014. That is because, for the past seven months, Lizardi has been incarcerated during the unprecedented worldwide COVID-19 pandemic.

As has been widely chronicled, the pandemic, for good and sound penological reasons relating to arresting the spread of the virus within the crowded confines of federal prisons and jails, has required extreme restrictions on prisoners' movements and visits. It has also exposed prisoners to heightened fears of contagion.[1]

---

[1]  *See* Timothy Williams, et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (May 20, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html; *see also United States v. Nkanga*, 450 F. Supp. 3d 491, 492 (S.D.N.Y. 2020) (citing *Interim Guidance on Management of Coronavirus Disease*

*2019 (COVID-19) in Correctional and Detention Facilities*, Ctrs. for Disease Control & Prevention 2 (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf) (highlighting danger faced by those in jails and prisons).

Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually arduous conditions merited recognition by courts in measuring the just sentence. *See, e.g., United States v. Carty*, 264 F.3d 191, 196-97 (2d Cir. 2001) (holding that that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures," and vacating and remanding the defendant's sentence "so that the [7] district court [could] reconsider the defendant's request for a downward departure, and do so in the light of this holding"); *United States v. Sanpedro*, 352 F. App'x 482, 486 (2d Cir. 2009) (noting that "[i]n imposing the sentence it did, the district court considered . . . [among other factors,] the harsh conditions of [the defendant's] confinement at Combita," in Columbia where he was detained before being extradited to the United States); *United States v. Salvador*, No. 98 Cr. 484 (LMM), 2006 WL 2034637, at *4 (S.D.N.Y. July 19, 2006) (holding that the defendant's pre-sentence conditions while "incarcerated in the Dominican Republic, awaiting extradition to the United States . . . warrant a downward departure"); *United States v. Torres*, No. 01 Cr. 1078 (LMM), 2005 WL 2087818, at *2 (S.D.N.Y. Aug. 30, 2005) ("depart[ing] downward, by 1 level, because of the harsh conditions of defendant's pretrial detention").

The same logic applies here. A day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing. *See* Def. Mem. at 6; *United States v. Rodriguez*, No. 00 Cr. 761-2 (JSR), 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020) ("The pandemic, aside from posing a threat to [a defendant's] health, has made [a defendant's] incarceration harsher and more punitive than would otherwise have been the case. This is because the federal prisons, as 'prime candidates' for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal." (citation omitted)); *United States v. Salemo*, No. 11 Cr. 0065-01 (JSR), 2020 WL 2521555, at *3 (S.D.N.Y. May 17, 2020) ("noting that the BOP has taken a number of steps to mitigate the spread of the virus in federal prisons . . . [including] restrictions on visitors, restrictions on gatherings . . . [and] lockdowns lasting at least [8] 14 days"); *United States v. Smalls*, No. 20 Cr. 126 (LTS), 2020 WL 1866034, at *2 (S.D.N.Y. Apr. 14, 2020) (noting that the "BOP has instituted a mandatory 14-day quarantine lockdown of all inmates across the BOP system"). Here, the Court's judgment is that the seven months in which Lizardi has spent in prison during COVID-19 offsets the need for him, in order to assure just punishment, to serve the next five months in prison, as opposed to in less restrictive confinement.

To be sure, the circumstance commonly invoked during the pandemic to justify release under § 3582—the defendant's heightened vulnerability to COVID-19, relevant to the factors of the "history and characteristics of the defendant" and "the need to provide the defendant with needed . . . medical care," *see* 18 U.S.C. § 3553(a) (1), (2)(D)[2]—is not present here, because Lizardi does not have (or claim to have) such a condition. Nonetheless, since March 2020, there has been an outsized risk, even for a medically ordinary prisoner, that the COVID-19 contagion, once it gains entry into the crowded environment of a prison, will spread. Although Lizardi cannot claim heightened vulnerability to COVID-19, his claim during the past seven months to have experienced heightened deprivation—and to have experienced unexpectedly punishing prison conditions—is credible. [9]

2  *See, e.g., United States v. Wilson*, 16 Cr. 317 (PAE), Dkt. 656 at 4-7 (S.D.N.Y. Aug. 31, 2020) (ordering compassionate release of defendant with heightened vulnerability who had served the substantial majority of his sentence and played a low-level role in a drug trafficking conspiracy); *United States v. Simon*, 18 Cr. 390 (PAE), Dkt. 507, at 5-9 (S.D.N.Y. Aug. 27, 2020) (ordering compassionate release of elderly defendant, who had serious medical conditions and played a low-level role in a drug trafficking conspiracy); *United States v. Davies*, No. 18 Cr. 390 (PAE), Dkt. 479 at 4-7 (S.D.N.Y. June 26, 2020) (ordering compassionate release of elderly defendant, who had serious medical conditions and played low-level role in drug trafficking conspiracy); *United States v. Brown*, No. 18 Cr. 390 (PAE), Dkt. 472 at 4-7 (S.D.N.Y. June 17, 2020) (same); *United States v. Jasper*, No. 18 Cr. 390 (PAE), Dkt. 441 at 2-4 (S.D.N.Y. Apr. 6, 2020) (ordering compassionate release of defendant with an immune-inflammatory disease who had served all but 34 days of a four-month sentence).

Accordingly, the Court finds that the § 3553(a) factors, viewed collectively today, are consistent with expediting Lizardi's release from FCI Fort Dix by five months, as he requests.

For much the same reasons, the Court finds that the assembled considerations provide "extraordinary and compelling reasons," *Brooker*, 2020 WL 5739712, at *7, justifying Lizardi's early release. The Court primarily bases this finding on the unexpectedly punishing quality of the past seven months that Lizardi has spent in custody during the unprecedented pandemic; the fact that Lizardi, dating back to 2014, has been identified by the Court as not presenting a continuing danger to society; the fact that Lizardi by now has served close to his entire lengthy sentence; and the imminence of his release date to a halfway house. His case thus accords with others during this extraordinary time in which the Court has recently granted compassionate release to prisoners who had served the vast majority of their sentences.[3]

3  *Compare United States v. Knox*, No. 15 Cr. 445 (PAE), Dkt. 1088 (S.D.N.Y. Apr. 10, 2020) (granting compassionate release of defendant who had served all but seven months of an 88-month sentence); *United States v. Hernandez*, 451 F. Supp. 3d 301 at 305 (same for defendant who had asthma and had served 17 months of a 24-month sentence and was scheduled for release in four months); *United States v. Benjamin*, No. 15 Cr. 445 (PAE), Dkt. 1144 at 6-7 (same for defendant who had asthma and had served nine years of his 10-year sentence), *with United States v. Harris*, No. 15 Cr. 445-11 (PAE), 2020 WL 5801051 (S.D.N.Y. Sept. 29, 2020) (denying compassionate release where gang defendant had served less than half of his 132 month sentence); *United States v. Romero*, No. 15 Cr. 445 (PAE), 2020 WL 2490027, at *1 (S.D.N.Y. May 14, 2020) (denying compassionate release for gang defendant who had engaged in shootings and had served "approximately 54 months of his significantly below-guidelines sentence of 78 months' incarceration"); *United States v. Francisco*, No. 19 Cr. 131 (PAE), Dkt. 416 at 1, 5 & n.5 (S.D.N.Y. June 29, 2020) (denying compassionate release where defendant had served only 60% of his sentence). --------

The Court accordingly grants Lizardi's motion for compassionate release from prison pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). The Court will direct that, as a condition of the term of supervised release that upon release will immediately commence, Lizardi spend the first six months following release in a halfway house, or, if a suitable placement cannot be made by the United States Probation Department, under strict conditions of home confinement. Such restrictions are intended to advance various interests recognized by § 3553(a), including to assist in Lizardi's reintegration into society. To assure time to implement this order, the Court orders Lizardi's release on October 19, 2020. The Court directs that the Government and defense, in consultation with the Probation Department, submit to the Court, by noon on October 16, 2020, an agreed upon order setting out the terms of Lizardi's halfway house placement, or, if a suitable halfway house placement cannot be made, setting out the conditions of home confinement.

SO ORDERED.

/s/ _____

casetext

United States v. Lizardi    11 Cr. 1032-55 (PAE) (S.D.N.Y. Oct. 9, 2020)

PAUL A. ENGELMAYER

United States District Judge Dated: October 9, 2020

New York, New York

casetext

EXHIBIT -- 8



**U.S. Department of Justice**
**Memorandum**
Federal Bureau of Prisons

*Federal Correctional Complex,*
*Allenwood*

*United States Penitentiary*
*P.O. Box 3500*
*White Deer, PA 17887*

Date: January 31, 2018

## MEMORANDUM FOR LSCI/FCI ALLENWOOD UNICOR INMATES (AWFT)

**FROM:**        **M. Sauder**, UPHOLSTERY/WOODWORKING FOREMAN

**SUBJECT:**        **FCI FACTORY (AWFT) MOTHBALLED JAN 2018**

**Name:**
**Register No:**

| Turnquest, Jamal |
| 43258-037 |

The purpose of this memorandum is to avoid any confusion
about the UNICOR duty status of the above referenced inmate.

This memorandum is for all Federal Prison Industry inmates  assigned to  the
LSCI/FCI Allenwood, Unicor Furniture  Factory Operations. Specifically, on June 10, 2016, a
directive order was provided from Unicor Central Office, Chief  a directive order  Executive Officer ,
Mr. Gary Simpson, to **"MOTHBALL"** the LSCI/FCI Furniture Factory Operations beginning
January 1, 2018. Therefore, on Monday January 1, 2018, all operations  involving the making
of furniture products will begin the transfer process to FCI Forrest City, Arkansas.
Once operations are completed all  inmates assigned to the AWFT
operations will be unemployed by the Federal Prison Industries.

This memorandum is to be issued and placed in each Unicor inmate's Central File
in the event the inmate is transferred or released from Federal Custody.
This memorandum will provide as proof the inmate was in good  standing with
Federal Prison Industries. If the inmate is transferred to another facility with a
Unicor factory the inmate should retain all longevity pay
and special considerations of the hiring process over **NON-UNICOR**
inmates assigned at that specific institution.

```
UNICOR INMATE EARNING STATEMENT      Pay Period: 02/28/2018 Pay Date: 03/02/2018
                                     INST:  05    FACTORY:    AWFT
REG/NAME: 43258037                   GRADE: GRADE1 GROUP:
          JAMAL TURNQUEST            CREW:  AW F MGR
```

|        | GROSS  | - | TAXES | - | POST TAX DEDUCTIONS | = | NET PAY |
|--------|--------|---|-------|---|---------------------|---|---------|
| Curr:  | 55.77  | - |       | - |                     | = | 55.77   |
| YTD:   | 287.58 | - |       | - |                     | = | 287.58  |

| EARNINGS |        | RATE | HOURS | AMOUNT |
|----------|--------|------|-------|--------|
| 8010     | HOL    | 1.15 | 7.00  | 8.05   |
| 8021     | OTHER  | 0.00 | 98.00 | 0.00   |
| 8510     | REG    | 1.15 | 34.31 | 39.46  |
| 9520     | LONG20 | 0.20 | 41.31 | 8.26   |

```
DATE COMPUTED
HIRE DATE        06/19/2014
VACATION DATE    06/19/2014
LONGEVITY MONTHS     45.00
UNICOR WORK START 06/19/2014
ACCRUED VAC HOURS    63.00
PREV. YRS VAC HOURS
UNPAID CALLOUT     98.00

STATUS 94

DEDUCTIONS/ADJUSTMENT
```

E X H I B I T -- 9

```
 FTDOD          *         INMATE EDUCATION DATA      *    08-20-2020
PAGE 001 OF 001 *              TRANSCRIPT            *    14:20:22

REGISTER NO: 43258-037      NAME..: TURNQUEST            FUNC: PRT
FORMAT.....: TRANSCRIPT      RSP OF: FTD-FORT DIX FCI


-------------------------- EDUCATION INFORMATION --------------------------
FACL ASSIGNMENT DESCRIPTION                 START DATE/TIME STOP DATE/TIME
FTD   ESL HAS    ENGLISH PROFICIENT         10-05-2010 1232 CURRENT
FTD   GED HAS    COMPLETED GED OR HS DIPLOMA 10-08-2010 0806 CURRENT


-------------------------- EDUCATION COURSES --------------------------
SUB-FACL    DESCRIPTION                  START DATE  STOP DATE EVNT AC LV  HRS
FTD GP      HEALTHY MINDS AND BODIES     08-08-2020  CURRENT
FTD GP      CREATING A BUSINESS PLAN -EAST 04-30-2020 05-28-2020  P  C  P   24
FTD GP      RPP2-JOB                     01-23-2020  03-04-2020  P  C  P    6
FTD GP      CREATING A BUSINESS PLAN -EAST 10-21-2019 02-11-2020  P  C  P   24
FTD GP      REAL ESTATE 2 - EAST         10-21-2019  02-11-2020  P  C  P   24
ALF         WELLNESS INSTRUCTOR          04-12-2013  05-28-2013  P  C  P    2
ALF         TOTAL FITNESS                01-15-2013  03-19-2013  P  C  P    2
ALF         INTRODUTION TO CERAMICS      11-21-2012  12-15-2012  P  C  P    8
ALF         RPP(6)- NON-RES DAP          06-05-2012  10-30-2012  P  C  P   40
ALF         RPP(6)- NON-RES DAP          09-15-2012  10-30-2012  P  C  P   40
ALF         RPP(6)- (15)HOUR DRG PGM     01-07-2012  03-27-2012  P  C  P   15
PHL M       ORIGAMI                      07-08-2010  07-28-2010  P  C  P   12
PHL M       THE MUSCLES & BONES CLASS    07-18-2010  07-18-2010  P  C  P    1
PHL M       INTRO TO HIGH BLOOD PRESSURE 07-11-2010  07-11-2010  P  C  P    1
PHL M       INTRO TO STRESS MANAGEMENT   10-21-2009  10-21-2009  P  C  P    1
PHL M       ELECTRONIC LAW LIBRARY CLASS 10-22-2009  10-22-2009  P  C  P    2
PHL M       BEGINNER BASKETBALL          10-15-2009  10-23-2009  P  C  P    2
PHL M       INTRO TO HIGH BLOOD PRESSURE 11-23-2009  11-23-2009  P  C  P    1




G0000       TRANSACTION SUCCESSFULLY COMPLETED
```